COMMONWEALTH OF KENTUCKY
LETCHER CIRCUIT COURT

CIVIL ACTION NO. 18-CI-00253

RUBY BEAUPARLANT                                     PLAINTIFF

VS:

JIM T. WARD                                          DEFENDANT

## I N D E X

| Name of<br>Witness: ALISHA CONGLETON | Page<br>Number |
|---|---|
| Caption and Appearances. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 1 - 2 |
| EXAMINATION<br>By Mr. Combs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 - 33 |
| EXAMINATION<br>By Mr. Shaw . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 33 - 58 |
| RE-EXAMINATION<br>By Mr. Combs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 58 - 62 |
| RE-EXAMINATION<br>By Mr. Shaw. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 62 - 68 |
| Reporter's Certificate. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 69 |

Plaintiff Exhibits A - D
Defendant Exhibits 1 - 5

Exhibit 1

COMMONWEALTH OF KENTUCKY
LETCHER CIRCUIT COURT

CIVIL ACTION NO. 18-CI-00253

RUBY BEAUPARLANT                                              PLAINTIFF


VS:


JIM T. WARD                                                         DEFENDANT




--------------------------------------------------------------------------------

DEPOSITION OF
ALISHA CONGLETON

--------------------------------------------------------------------------------


The deposition of **ALISHA CONGLETON** was

taken pursuant to Notice Of Deposition on Tuesday, July 9, 2019 at Jerry

W. Wicker Law Office, 39 West Main Street, Hindman, Kentucky. Said

deposition to be used for any purpose consistent with the Kentucky Rules

of Civil Procedure on behalf of Plaintiff herein.


Exhibit 1

Plaintiff was represented by counsel, Hon. E. Seth Combs, KBA#: 96093, of Jerry W. Wicker Law Offices, P.O. Box 1590, Hindman, Kentucky, 41822.

Defendant was represented by counsel, Hon. Jonathan C. Shaw, of Porter, Banks, Baldwin & Shaw, PLLC, P.O. Drawer 1767, Paintsville, Kentucky, 41240.

**********************************

Exhibit 1

**ALISHA CONGLETON,** the witness, after first being duly sworn, was examined and states as follows:

EXAMINATION

By Mr. Combs

Q1    Could you please state your name for the record?

A    Alisha Congleton.

MR. COMBS:

Miss Congleton, my name is Seth Combs and as you're likely aware, I have noticed you for a deposition today in the case of Ruby Beauparlant, who I represent, against Jim Ward; and just in the way of ground rules, I'm going to be asking you some questions and if you -- when you respond, if you respond with a "yes" or a "no," say that clearly so the Court Reporter can pick it up; "uh huhs," "huh uhs," and head-nods are natural but the Court Reporter can't pick those up; and if I ask you a question and you answer it, I'm gonna assume that you understood it.

ALISHA CONGLETON:

Okay.

Exhibit 1

MR. COMBS:

Is that fair?

ALISHA CONGLETON:

Yeah.

MR. COMBS:

I am the most guilty of all of wording questions

poorly, so if you don't understand something,

please let me know and I'll be happy to

rephrase it. If you need to take a break at any

time, that's completely fine. I just ask that if -- if

I've asked you a question, answer the question

first and then we can take a break.

ALISHA CONGLETON:

Okay.

MR. COMBS:

With that being said, let's go ahead and get

started.

Q2          What is your present address?

A           My physical address is 3-1 -- 31 Camden Road

-- C-a-m-d-e-n -- Road, Jenkins, Kentucky, 41537.

Q3          And are you currently employed?

A           No.

Q4          And what was your most recent employment?

4

Exhibit 1

| A. | Letcher County Sheriff's Department. |

Q5       How were you so employed?

A        I was a Deputy there, a Sergeant at the

Letcher County Sheriff's Office.

Q6       When did your employment end there?

A        In December of 2018.

Q7       When did you start working there?

A        February of 2015.

Q8       And when you were first employed, were you

employed as a Deputy as well?

A        Yes.

Q9       Were you promoted to Sergeant or was that --

A        Yes.

Q10      What was your position called when you first

started?

A        Deputy.

Q11      And you were fulltime?

A        Um hmm, yes.

Q12      So approximately how many hours a week did

you work between the time you started work there until December of

2018?

5

Exhibit 1

A                            I got paid for 40 hours a week but sometimes, I worked a lot more than that; so it was -- it varied. It varied dependent on what was going on.

Q13                   Did you have a set shift or did that vary?

A                            Typically, I worked eight to four was my schedule when this incident occurred, probably; but when I first started, I worked four to midnight.

MR. COMBS:

                         And we'll get to the particulars shortly.

Q14                   When you would begin work each day, is -- as a Deputy, is that something you had to go in and clock in at the Sheriff's Office or would --

A                            No.

Q15                   Would you be required to report to the Sheriff's Office first?

A                            No, not necessarily. Sometimes, you know, I'd get a call and respond to a complaint from home or something like that; so, no.

Q16                   As part of your job duties, would you be required to work in the actual Sheriff's Office?

A                            Yeah, sometimes.

Q17                   And what -- just briefly, what were your job duties when you would have to do work in that capacity?

**6**

Exhibit 1

A                                    It would be when I was doing my paperwork, like casework; or, you know, if I was in the office if I wasn't doing anything, you know, the Sheriff's Office collects taxes and so we were trained to do that as well if somebody came in to pay their taxes; and we wouldn't -- as a Road Deputy wouldn't do anything else, you know. Out of courtesy for the office employees, we'd take a tax bill or something but we wasn't required to do that, just did, you know; so things like that.

Q18                                  If you know, approximately how many employees worked in the -- the Letcher County Sheriff's Office on any given day?

A                                    Anywhere from three to five, counting the Sheriff if he was there. Usually, two in the office and then the Deputies would come in and out.

Q19                                  The premises where the Letcher County Sheriff's Office is located, do you know the address?

A                                    It's 6 Broadway Street, Whitesburg, Kentucky, 41858, I -- 4-1-8 -- I don't know; I can't remember the zip code.

Q20                                  That was where the Sheriff's Office was throughout the entire time you worked there, correct?

A                                    Yes.

Q21                                  Does the Sheriff's Office have any other offices or branches aside from that?

A                                    No, not to my knowledge.

Exhibit 1

Q22                    What is the normal business hours of the Sheriff's Office?

A                      From eight until four.

Q23                    8 a.m. to 4 p.m.?

A                      Yes.

Q24                    Is it your understanding that the Sheriff's Office is open to the public?

A                      Yes.

Q25                    So for instance, anytime between 8 a.m. and 4 p.m., anybody could walk into the Sheriff's Office off the street.

A                      Yes, um hmm.

Q26                    During your time there, did the office close down for lunch or anything like that?

A                      Not typically.  Like if something special were to happen and we'd go out -- you know, like if ever body had to be gone at one time, we put a note on the door; but typically, we ate lunch inside and it was open.

Q27                    Do you know who owns the building that the Sheriff's Office is housed in?

A                      I'm assuming it's the Fiscal -- the Letcher County Fiscal Court.

Q28                    But you don't know for certain?

Exhibit 1

A                    I don't know for certain but I know that they maintain it; like they -- when we needed something whether it be cleaning supplies or air-conditioning, that's who we contacted.

Q29              So if you needed supplies, you'd have to go through the Fiscal Court?

A                    Yes.

Q30              If you know, who was the point of contact?

A                    It would've been the Judge's Office.

Q31              The County Judge Executive?

A                    Yes. It would've been -- I can't remember his name but he does the like maintenance work. I think his name was Jordan, and he still works at the Fiscal Court. He's kinda like the handyman; he kinda does everything around there. So he -- we contacted Judge's office, which at the time was Judge Jim Ward I think.

Q32              So they would -- you would contact the Judge's Office and they would then contact Jordan or --

A                    Jordan was an employee there. He was like their maintenance person. Like he does the -- the yard work, the landscape, just anything around there. I think he's worked there for quite a while. Usually, he would come over if we had an issue like the fluorescent light bulbs need to be changed or whatever, they'd usually send him over. I think that's his -- his job there.

Q33              You said you don't recall his last name?

9

Exhibit 1

A                              I wanna say its Abshire but I don't know for
sure.

Q34                            Do you have any idea if he's still employed in
that --

A                              I think he is, yeah; but I'm not -- I haven't -- you
know, I don't really frequent there anymore.

Q35                            I guess when is best of your memory last time
you were on or in the premises of the Letcher County Sheriff's Office?

A                              It's been several months ago and I can't
remember.

Q36                            But in 2019?

A                              Yeah, I think I've been there in 2019.  Trying to
think of why I went there; but, yeah, I've been there recent -- you know,
like since the new -- since the election. I've been there and if I'm not
mistaken, I've seen Jordan there.  So I'd say he still works there.

Q37                            And while you worked there as a Deputy, do
you recall ever personally contacting either Jordan or the Judge
Executive's Office about an issue?

A                              No, that usually was LaShawna Frasier.  She
was our office -- I don't know what you'd call her.  She works at the office.

Q38                            Do you know if LaShawna Frasier is still
employed there?

A                              Oh, yeah.

Exhibit 1

Q39                         During your time there as Deputy, I know you

mentioned that Jordan would come and change the light bulbs but do you

recall any other -- observing Jordan or anyone else doing any other kind of

work of that nature, repair work or anything like that?

A                          He done everything there like, you know, if the

toilet was broke or whatever. When that lady fell, I think he came over

and painted the -- the sidewalk around there. That sticks out because

that's why I'm here.

MR. COMBS:

                            Sure; and we'll get to that in a second.

A                          I believe now, I think that was him.

Q40                        So and let me just make sure I got this right, if

-- while you were a Deputy if you saw a problem with the premises that

needed a repair, a fix, or was causing problems, such as a broken toilet,

the protocol was for you -- whoever seen it to let LaShawna Frasier know

and she would make arrangements to have it addressed?

A                          I don't know that she was specifically the one

responsible for that but since she worked at the office and she kinda took

care of the financial things at the office, that's usually who took care of

that; because we were, you know, working the road and stuff. So, yeah,

typically she is the one that contacted -- you know, if something was

wrong, she'd call them or --.

Exhibit 1

Q41                       Do you know whether or not there was any rule on whether you could try to make the repair yourself or address the problem yourself?

A                        I don't know that there was a rule but typically, it didn't happen.  If something tore up, they usually contacted the County Judge's Office to fix it.

Q42                       Do you know if anyone other than the Judge's Office was contacted for something like that?

A                        Probably for like if it's something that the Judge's Office couldn't take care of like heating and cooling or something to that nature; but typically, there wasn't a whole of -- in my time there -- maintenance done and when it was, it was like something small, you know, like maybe plumbing or, you know, something like that.

Q43                       During your time there, was there any sort of construction or renovation to either the inside or the outside of the building?

A                        Not to my knowledge, no.

Q44                       As -- when you were first hired on as a Deputy or anytime thereafter, were you ever provided or issued any sort of handbook or manual by the Sheriff?

A                        Yeah.

Q45                       Do you recall like what that's called or what it looks like?

Exhibit 1

A                    It's just an employee handbook. It's like a -- but mine particularly -- or mine was consistent with law enforcement procedures; it was a policy manual.

Q46                  Do you know -- well, do you still have that?

A                    Yes.

Q47                  Did you bring it with you today?

A                    I did not.

Q48                  Would you be willing to provide that to myself or defense counsel to copy and return?

A                    Sure; yeah. They -- when they updated it -- I will say this. Like anytime a policy was added or changed, the employees didn't get a copy of it. They would just put it in -- like there was an -- there's an official policy manual that LaShawna keeps at her desk and anytime a policy was added to that, it would go in that but it wouldn't typically -- so mine may not be the most up-to-date one.

MR. SHAW:

                              I was gonna say it may be easier to just do
                              an Open Records Request to the Sheriff's
                              Office --

ALISHA CONGLETON:

                              Yeah.

MR. SHAW:

                              -- for a copy.

Exhibit 1

ALISHA CONGLETON:

> You're gonna get your most up-to-date one
> from there because they -- like I said, if they
> added something small or whatever or just
> added anything, they wouldn't pass it out to
> ever body. It'd just go in that one.

Q49     So to the extent that there were changes or
additions to the policy or handbook rather, about how frequently did that
happen?

A     Not -- not very frequently. Like in my time
there -- and sometimes they would just put stuff in there and I don't even
think anybody, you know, knew so -- you know, knew about it; but in my
time there, maybe a couple times, there was like a policy thing; or if we got
a new software, piece of equipment or something, they had to put a policy
in there regarding it or something.

Q50     You said "they." Who or how does it get put in
there?

A     It would be probably the Chief Deputy or
Captain and in my employment there, it was Barry Engle or the Sheriff,
Danny Webb. The Sheriff is the only one to my knowledge -- I think how it
worked at the Sheriff's Office -- is allowed to make policy or procedure
changes. So it would've been the Sheriff that would make a policy
change. There was actually a policy about that; that there -- that the

Exhibit 1

policy at the Sheriff's Office could only be changed or supplemented by the Sheriff himself, so --.

Q51                          I see, okay. So it's your understanding the Fiscal Court didn't have any input on that.

A                            Not to my knowledge; not as it -- as it relates to my employment as a law enforcement officer.

Q52                          And do you know if the building the Sheriff was in was leased at all?

A                            I don't know.

Q53                          How many entrances are there to the Letcher County Sheriff's Office?

A                            I think there's three doors that -- that connect to the exterior but there's only one door that's accessible to the public. The rest of them was locked and, you know, had to have a key to get in during business hours.

Q54                          You said three total doors, only one of which is accessible by the public?

A                            Yes, to my knowledge.

Q55                          I'm going to show you something. I'm gonna show you a photo. Can you describe what you see pictured there, what building you see pictured?

A                            It's the front of the Letcher County Sheriff's Office.

Exhibit 1

Q56                         And that -- the one door that's accessible to the

public, is that pictured in that photo?

A                           Yes; it's right where there's -- those two guys

are standing would be the front door.

Q57                         And if you could -- I'm gonna give you a pen --

just draw an arrow to that door, right beside of it.

A                           Okay [does as asked].

MR. COMBS:

                            I'll attach that as Exhibit A.

Q58                         And I'm going to move into specifically why

we're here today, which is on behalf of my client, Ruby Beauparlant. Are

you familiar with that name?

A                           I am.

Q59                         How is it that you're familiar with her name?

A                           She -- you know, I really don't know. She

came into the Sheriff's Office before and during the election, I campaigned

for a candidate, Eugene Slone; and it seems like Miss Beauparlant, I knew

her through that. You know, I didn't know her but I probably campaigned

her, you know, so -- and then, the name's familiar because I got this

subpoena but other than that, I really don't -- don't know her; just other

than it's a small town and you know ever body.

Q60                         Do you happen to recall an occasion where --

do you happen to recall speaking to her on November 1st of 2017?

Exhibit 1

ALISHA CONGLETON:

On November the 1st, 2017 --

MR. COMBS:

Um hmm, yes.

ALISHA CONGLETON:

-- me speaking to her?

MR. COMBS:

Um hmm, yes.

A           I would not know unless you would tell me what we supposedly spoke about.

Q61         Well, do you recall anyone being injured on the premises that day --

A           Yes.

Q62.        -- of the Letcher --

A           I remember her falling at the Sheriff's Office. I don't remember when it was.

Q63         Alright, but would November 1 of 2017 sound about right to you?

A           Yeah, if that's what you say.

Q64         Can you kind of tell us what you know about Ruby falling?

A           I know that she had came to the Sheriff's Office. I say "Sheriff's Office," but the water depart' -- the Letcher County

Exhibit 1

Water Department is in that building also. So I'm not sure why she was there. She could've been paying her water bill, tax bill, whatever; but she was in the Sheriff's Office and when she left, she fell right here in this -- there's like -- I think she fell right here around this corner and I don't know how -- I must've been in the lobby or -- somebody fell, so I ran out and that's basically all I know about it.

MR. COMBS:

I'm gonna interrupt you just real quick.

Q65                   If you could, mark with an "X" on there --

ALISHA CONGLETON:

About where she fell?

MR. COMBS:

Yeah.

A                   I'm gonna put a "X" where she would've -- when she fell, where she would've been laying, would've been about right there'ish.

Q66                  The "X" you've marked on that Exhibit A --

A                   Um hmm.

Q67                  -- represents where you saw --

A                   I think she -- there's a stepdown right here when you come out of the Sheriff's Office. There's a ramp that goes this way and then there's a step in the front; and she -- I guess when she stepped off of that, she tripped over the step there.

Exhibit 1

Q68                    And let me back up a little bit. You mentioned
the water company is -- or Letcher County Water & Sewer is also in that
building.

A                      Um hmm, yes.

Q69                    Is there any other entity that -- that you share
that building -- or the Sheriff shares the building with?

A                      The -- the Letcher County Coroner's Office is
also in there; and use to, the Letcher County Government Channel, seem
like they had an office back there.

Q70                    November of 2017, would you say -- would it
just be the Sheriff, the water company and the Coroner?

A                      Yes, probably; more than likely, yes.

Q71                    Can you describe how that -- that is?  Is the
Sheriff's Office on one floor?

A                      It's all on one floor.  You walk in and when you
walk in the front lobby, there's some glass windows to your right, it's the
Sheriff's Office; and then if you look straight ahead, there's a single glass
window and that's where you pay your water bill.  The Coroner's Office is
in the back hallway back there.  It's one of the -- one of the offices in the
back.

Q72                    And did -- did either the Coroner or the water
and sewer office have different operating hours than the Sheriff's Office?

Exhibit 1

A                              Well, the Coroner just came and went. You
know, they had a key there so they -- you know. They didn't really have
office hours to my knowledge but I think the water department was the
same as the Sheriff's Office.

Q73                            So I'll ask the question differently.  Was -- to
your knowledge, was that building accessible by the public at any time?

A                              No; eight to four, and after that it was closed.
The front door would be locked.

Q74                            Is that Monday through Friday or weekends
too?

A                              Monday through Friday.

Q75                            When you say that Miss Beauparlant came in
on November 1st, do you remember about what time of day that was?

A                              I have no idea.  It would be between -- I would
say between eight and four 'cause she was probably there doing some
sort of business, like paying a bill or whatever.

Q76                            Did you see her come in the Sheriff's Office
that day?

A                              That's been two years ago.  I -- I don't recall if I
actually seen her go in.  I -- I remember the incident of her falling but I
don't remember when she came, how long she stayed, or even why -- you
know.

Q77                            Did you -- did you see the fall occur or --

Exhibit 1

A                                   I don't -- I don't know if I actually seen her fall

but I do -- like I -- it seems like I do remember like seeing her on the

ground or like -- I don't know, I must've been somewhere in close

proximity. 'Cause whenever she fell, I don't know if somebody yelled,

"Somebody fell," or -- if I seen her fall; but I ran out there, you know, to

check on her but I don't really recall actually seeing her fall.

Q78                                 So best of your memory, you just remember

kind of coming to her aid.

A                                   I know she fell, yeah, 'cause she hurt her -- I

think she hurt her leg, or ankle, or something.

Q79                                 Do you recall -- besides yourself and my client,

do you recall whether there was anyone else in the immediate vicinity of

where she fell?

A                                   Oh, I'd say LaShawna would've been there

'cause she works in the office, and probably the people from the water

company but I don't recall if they were, you know, there for sure.

Q80                                 Did you help my client to her feet?

A                                   I don't recall if I did or not, to be honest with

you.

Q81                                 You don't recall if you helped her to her car or

not?

A                                   No.  I don't even remember if she left in an

ambulance or if she went to the hospital or exactly the extent of it or --.

Exhibit 1

Q82                         Do you recall her making any statements to
you?

A                           No, not right off.  If I -- you know, if she did and
you -- if, you know -- if you would say what it was, then I might would
recall but I don't really recall conversation or anything.

Q83                         Do you recall making any statements to her at
all?

A                           Not right off, no.

Q84                         Do you recall her saying anything about how
she fell?

A                           That she slipped -- that she fell off of this -- the
corner right here.  There -- you know, there used to be like a -- well, it's
here in this photo.  There's like a metal railing and years ago -- well, not
years ago but sometime prior to this incident, there was a gentleman that
-- he was an elderly gentleman and I think he's deceased now; but he
pulled his truck up here and somehow or another, he ran into the front of
the Sheriff's Office and knocked this railing off; and the corner of that --
that railing was chipped off and so I don't know if, you know, that could've
been the reason that she fell but the corner of this right here was chipped
off and it was never repaired after the guy ran through the building.

Q85                         And do you know why it was never repaired?

A                           I have no idea.

Exhibit 1

Q86                          Did that occur while you were employed there or before?

A                          While I was employed there. I was actually in the building. It scared us all to death 'cause it sounded like somebody ran through the front -- run through the front -- front of the Sheriff's Office.

Q87                          Did the damage that was done in that, did that create any problems for the public or the Sheriff's --

A                          It was just --

Q88                          -- employees?

A                          I don't know that it created any problems. It was ugly but that's about it. Like it -- the corner of that, and it's probably still like that if you go look at the Sheriff's Office, the -- you know how a sidewalk, the corner of it's squared off. This part right there was like -- they'd be like three or four bolts that held -- held a -- like a railing to concrete; and so as you can imagine when a truck run through it, it knocked it off and it chipped the corner edge of it off, just like concrete's chipping off and it's probably still like that I'd say.

MR. COMBS:

I'm going to hand you a photo. I'm going to show you that photo and, yeah, you might have to orient yourself to it. This is the correct orientation. In other words, this is right side up. Turn it.

Exhibit 1

ALISHA CONGLETON:

Like this?

MR. COMBS:

Yes.

ALISHA CONGLETON:

Oh, okay. That looks better.

MR. COMBS:

Yeah, I had the same problem as well.

Q89     So does -- does that look at all familiar to you?

A     Well, that would be probably the corner but if

you had an aeri' -- a view aerial --

ALISHA CONGLETON:

Is this the corner right here?

A     'Cause it's hard to tell.  There's a lot of chipped

places probably all over the place on the sidewalk but if -- that's probably

about what that looks like right here. This corner right here's what I'm

talking about and that's -- and that would probably be about what that

would look like 'cause as you can tell, it's chipped off; looks like something

used to be screwed in there. There's a screw -- whatever.

Q90     And that's what I wanna talk about with where

you say it looks like something used to be screwed in.

A     Uh huh.

Q91     Do you see an object --

Exhibit 1

A                    Yes.

Q92                  -- sticking out of the ground? Okay.  Can you --

for the record, can you describe what that object is or what it looks like to

you?

A                    It's a bolt that used to -- looks like to anchor

something down like a railing. I think that's probably the bolt that used to

go to that rail that was attached there.

Q93                  If you could, circle that --

ALISHA CONGLETON:

                     Bolt?

Q93                  -- bolt for me.

A                    Um hmm [does as asked].

Q94                  So you believe that bolt used to secure a piece

of the railing?

A                    I believe so.  I'm not positive but I believe so.

Q95                  Do you know if anyone ever requested that that

be addressed?

A                    I have no idea if they did or not.

MR. COMBS:

                     I would mark that as Plaintiff's Exhibit B.

Q96                  Do you recall ever having seen anyone trip on

this particular area or around this particular area?

A                    Not to my knowledge.

Exhibit 1

Q97                         Is this nearby where you found my client after
she fell?

A                           Yes; it would be -- if that's that corner like I
said, you know -- it's just zoomed in there; but if this corner is that corner,
then it's pretty much exactly where she fell.

Q98                         And do you recall ever making the statement to
my client that day to the effect that -- that you or the Sheriff's Office had
been trying to get that fixed for a long time or had informed someone that
it needed fixed for a long time?

A                           I don't recall but it's very possible that I
could've said that, you know; but I wouldn't have been trying to get them to
fix it; you know, I mighta -- you know -- complained about it or something
like that with coworkers but the relationship between the Sheriff's Office
and the County Judge's Office wasn't a good one I'd say.  So it's probably
possible that --

Q99                         And how do you mean?  I mean can you kinda
--

A                           I don't think the Judge and the Sheriff liked
each other, so maybe he wouldn't send somebody over there in a big,
real, quick, fast in a hurry to fix something. I'm just -- I'm just assuming
that. I don't know that to be true.  Yeah, it's possible, you know. I do know
that -- I'm pretty sure when the guy ran through the building that they
notified the County Judge's Office that it had happened; 'cause if I'm not

Exhibit 1

mistaken, an Incident Report was done on that incident when the guy ran

through the building and an Incident Report was probably done whenever

Miss Beauparlant fell. So I don't know whether or not you've got access to

that but -- but there should be. I don't know if there's a form to fill out when

--.

MR. COMBS:

I'm gonna let you look at that.

ALISHA CONGLETON:

Hey, that's me.

Q100                    What do you mean "that's me?"

A                       I filled this out but I don't even recall filling it

out. I guess that's a -- like a -- a -- an Incident Report or Report of Injury or

something like that.

Q101                    And do you recall who you would've turned this

in to?

A                       I would've gave it to LaShawna and she

would've faxed it over or -- after -- after this lady fell. If I'm not mistaken

now, there was -- like I said, there was two incidents that I can recall in my

employment there that involved that sidewalk; and one was when the guy

ran through it and knocked the railing off; and two was when Miss

Beauparlant fell. Some point in time after I think Miss Beauparlant fell, the

-- I guess it would've been Heddy, the lady that worked downstairs was

the Judge's secretary, came over; and she may a got this when she came

Exhibit 1

over or something like --. We just thought it'd be a good idea, 'cause she was injured, to do an Injury Report.

Q102                    And is -- is this a form that you would have to go to the Judge's Office to get or do they have one in the Sheriff's Office or -- if you know.

A                    I would say that the Sheriff's Office would have it. If not, anytime we needed a form or anything like that, we'd call and they'd fax us what we needed over. I don't even remember filling that out but I know I did 'cause that's my handwriting.

MR. COMBS:

And I'd mark that as Plaintiff's Exhibit C.

Q103                    As far as Incident Reports or the procedure for when injury occurs at the Sheriff's Office, is that something that is addressed anywhere in the employee manual you referred to earlier?

A                    I don't recall. I -- if it is -- I don't know if LaShawna or somebody there told me to fill this out and I just happened to be the one to fill it out; but I'm always, I guess, a cautious person, law enforcement. So if something happens that I think may raise concern or whatever, I would document it in some way or another just because that's -- it's part of -- I don't know; I guess it's law enforcement and I've got in the habit of documenting stuff. So I don't know that I was told to do this by somebody that worked there or what but --.

Exhibit 1

Q104                    Do you ever recall personally seeing or hearing from someone else about anyone else falling in this particular area near the entrance?

A                    Not to my knowledge but I mean it's possible that other people fell but --.

Q105                    And the -- the individual that you said ran into the Sheriff's Office, do you recall his name?

A                    I think he had an initial name. I think A.J. or something like that. He was an elderly gentleman and I'd say that's probably why he -- he pulled right upon the front patio there.

Q106                    Do you remember what kind of vehicle he was in?

A                    It was like a pick' -- a full-size pickup truck that he was driving. Seems like he may be from the Craft Colley area, maybe, I'm not sure.

Q107                    You said that you're not aware of any repairs done after he -- this gentleman hit the building.

A                    I know at some point in time or another after either he ran through the building or Miss Beauparlant fell, they came over -- Jordan I think it was. They sent Jordan over and he painted with yellow paint the perimeter of the -- of where the step is; but prior to that, to my knowledge it wasn't painted, as you can see in this. I don't see any yellow paint here or there, so must've been painted after.

Exhibit 1

Q108    Do you recall seeing any paint, or signs, or warnings, or anything on the day of or prior to my client falling?

A    No.

Q109    And the decision to paint or put warnings up like what you referred to, that's something that it's your understanding the Sheriff's Office relies on Jordan or the Judge Executive's Office to do?

A    Yes, I think so.

Q110    And so they -- in other words, they don't -- you or someone else at the Sheriff's Office don't do it themselves.

A    No.

Q111    Are they allowed to, the best of your knowledge?

A    It's never come into question, to be honest with you, whether or not. There's nothing that I ever was told, "Don't paint the sidewalk," or anything like that. Can't get them to take the trash out, much less paint the sidewalk, so I never had to worry about it.

Q112    And do you recall if -- if my client had anything in her hands that day?

A    I don't really recall.

Q113    Do you recall her using any sort of cane, or crutches, or a walker, or anything whenever --

A    I don't remember if she did or not.

Q114    Was anyone with her that day?

Exhibit 1

A                              I don't remember that either.

Q115                  You said that my client was injured when she fell. Can you kind of describe what you remember or what you know about her injury?

A                              As we were sitting here talking, I was reading what I wrote here and looked like I'd put that she had visible scratches to the left knee and that she advised she twisted her right ankle. Reading that -- by reading that, I recall that.

Q116                  Do you recall seeing what kind of shoes she had on or anything like that?

A                              I don't.

Q117                  Just to clarify, it's your testimony that this bolt that we see in Exhibit B, I think, is there by virtue of the gentleman you referred to driving his truck into the building.

A                              Yes, I would imagine that's -- 'cause there used to be there and it did knock that loose when he -- either knocked it completely off; run on it, knocked it loose, when he ran through the building. So I'd imagine that's -- that has to be what that is.

MR. COMBS:

                        I'm gonna give you one last -- I'm gonna give you another photo we'll mark as Plaintiff's Exhibit D. If you could, take a look at that.

31

Exhibit 1

Q118                         As you can see -- and I'll use my copy to kinda help point you to where I'm referring to but if you look right there near where the handicap sign is depicted --

A                            Um hmm, yes.

Q119                         -- is the bottom of that black handrail there, is that what you believe to be --

A                            Yes.

Q120                         -- used to be --

A                            Yes.

Q121                         -- secured by that bolt?

A                            Yes, this bolt there.

Q122                         And so again, referring to the photo, this section of the -- the handrailing is the area where the gentleman ran his car into?

A                            Yes.

Q123                         And after he did, is that handrailing absent from there?

A                            I can't remember if it's like laid over and loose or if they finally took it off; but I know it did knock it loose, so I don't know that it's -- if it's still there or not.

Q124                         Was it still there at the time that my client fell?

A                            I don't recall. I know that it -- that it was damaged at least. I don't know if was just hanging over or if it was

Exhibit 1

completely gone but I know that it was knocked loose. That's what he ran into.

MR. COMBS:

I'm gonna pass the witness.

MR. SHAW:

I'm gonna get a little bit more background

information if you don't mind.

(Reporter's Note:

Date of birth and Social Security

Number was obtained off record.)

EXAMINATION

By Mr. Shaw

Q1          You're from Letcher County, correct?

A           Actually I'm from Knott County.

Q2          Knott County?

A           Yes.

Q3          If this case were to go to trial in Letcher

County, do you have many family members that reside --

A           No.

Q4          -- in Letcher or that work in Letcher County?

A.          I don't have any blood family, I don't think.

Q5          Are you married?

Exhibit 1

| A | Yes. |
|---|---|
| Q6 | Who are you married to? |
| A | Ashley Addington. |
| Q7 | A-d-d -- or -- |
| A | A-d-d-i-n-g-t-o-n. |
| Q8 | Is she from Letcher County? |
| A | She is, yes. |
| Q9 | Who are Ashley's parents? |
| A | Betsy and David Addington. |
| Q10 | Do you know if Betsy or David Addington work |

in Letcher County currently?

| A | They're both retired. |
|---|---|
| Q11 | Both retired. Does Ashley work? |
| A | Yes. |
| Q12 | Where does she work? |
| A | She's a teacher at the Jenkins Independent |

School Systems.

| Q13 | I think I already asked you this.  Do you have |
|---|---|

any family members that work or do business in Letcher County?

| A | Not to my knowledge. |
|---|---|
| Q14 | Have any siblings? |
| A | Yes. |
| Q15 | What are their first names? |

Exhibit 1

A                          My first brother, Jerry Jenkins, he's deceased;

Kevin Jenkins and Jeremy Jenkins.

Q16                        Any of their families in say the last five or ten

years, have they worked in Letcher County?

A                          No. Well, I take that back. My nephew worked

for a very short period of time at McDonalds in Whitesburg but now, he

doesn't. He works in Perry County now but he probably worked there for a

month or less.

Q17                        If I asked you what families you were related

to, what families come to mind besides the Jenkins?

ALISHA CONGLETON:

                           In Letcher County?

MR. SHAW:

                           Well, in Letcher or Knott.

A                          Gibson.

Q18                        Is that G-i-b --

A                          G-i-b-s-o-n. That's my -- my mother's from

Knott County and they were Gibsons from Knott County. My dad is a

Congleton but he's from -- originally from Ohio, so --.

Q19                        What about your grandmothers?

A                          Johnson, from Knott County also.

Q20                        Ever been in the military?

A                          No.

Exhibit 1

Q21                          When did you complete the Academy?

A                            2011.

Q22                          Before working as a Deputy in Letcher County,
did you have any law enforcement experience anywhere else?

A                            I worked as a police -- police officer at
Whitesburg Police Department.

Q23                          Whitesburg Police Department? How long did
you work there?

A                            Four years.

Q24                          Was that just prior to --

A                            Yes.

Q25                          -- going to Letcher County?

A                            Uh huh.

Q26                          Have you worked anywhere since you left your
employment with Letcher County Sheriff's Department?

A                            No.

Q27                          I think you already testified in that -- in that 6
Broadway Street, to your knowledge, there was the Coroner's Office,
Letcher County Water --

A                            Yes.

Q28                          -- and then the Letcher County Sheriff's Office.

A                            Yes.

Exhibit 1

Q29                              Does the Sheriff's Office window face the front

door?

A                                No.

Q30                              Do you know if the Letcher County Water

Offices, if their window faces the front door?

A                                It does, yes.

Q31                              It does, okay. I believe you testified you

independently don't know of any reports or issues that had been relayed to

anyone concerning the entrance area or entrance coming into the building.

A                                Yes.

Q32                              You do or you don't?

ALISHA CONGLETON:

                                 I'm sorry; will you restate the question? I'm

                                 sorry.

Q33                              I believe you testified that you, individually, are

not aware of any reports of issues concerning the entrance coming into

the building, other than what may've been stated to -- I can't remember the

lady's name.

ALISHA CONGLETON:

                                 Miss Beauparlant?

MR. SHAW:

                                 No.

A                                Miss Frazier.

Exhibit 1

Q34                         Frazier.

A                           Yes. Yeah, I don't recall specifically when Seth
brought up that -- that I'd -- me or somebody at the Sheriff's Office had told
Miss Beauparlant that we'd been trying to get that fixed. I don't doubt that
maybe somebody didn't say that or that that didn't happen, I just don't
remember it specifically.

Q35                         At some point in time, some guy in a pickup
truck ran upon the sidewalk --

A                           Yeah.

Q36                         -- and hit the -- so it was obvious something
had happened.

A                           Right.

Q37                         Has anybody talked to you about your
testimony?

A                           No.

Q38                         How did you first become aware or find out that
you were gonna be called to testify today?

A                           Well, I's on vacation and when I got back from
vacation, I had a -- a certified -- a thing saying that I had certified mail at
the post office from Jerry Wicker Law Office.

Q39                         Did you call them and ask them what it was --

A                           I had no idea; yeah, I didn't know what it was
about, so --.

Exhibit 1

Q40     Well, I mean did you call and ask what it was about?

A       Yes.

Q41     What were you told?

A       Just said that it was a -- that I'd witnessed a slip-and-fall and I -- so I went to the post office and that's how I knew what it was; 'cause I didn't -- I had no idea. I's like, "What in the world?" but when I seen her name, I -- I remembered her falling and that happening.

Q42     Did anybody provide any documents for you to review --

A       No.

Q43     -- prior to your testimony? So you weren't given a copy of the Incident Report or anything of that nature before --

A       No; I've never -- I didn't know I -- I done that until I seen it.

MR. SHAW:

        Well, a lot of these are background questions everybody --

ALISHA CONGLETON:

        That's fine; that's fine.

Q44     What's your highest level of education?

A       Bachelor's Degree.

Q45     Where did you receive that from?

Exhibit 1

| | |
|---|---|
| A | Eastern Kentucky University. |
| Q46 | Is that in Police Science? |
| A | It is in Criminal Justice. |
| Q47 | Criminal Justice? |
| A | Yeah. |
| Q48 | When did you receive that? |
| A | 2011. |
| Q49 | Ever been convicted of a felony? |
| A | No. |
| Q50 | Charged with any crimes in the last ten years? |
| A | No. |
| Q51 | You ever testified in a lawsuit before in Civil |

Court?

| | |
|---|---|
| A | You know, I don't think I have. |
| Q52 | And I assume you've given testimony in |

Criminal Court before.

| | |
|---|---|
| A | I have, yes. |
| Q53 | Did you ever present cases? |
| A | Yes. |
| Q54 | Have you individually -- I'm aware of one |

lawsuit that you're currently involved in.

| | |
|---|---|
| A | Um hmm, yes. |

Exhibit 1

Q55                      Other than that lawsuit, have you been involved in any other litigation?

A                       Years ago, I had someone hit me and run and I was represented by Adam Collins but I didn't have any litigation or anything like that. It was settled out of Court.

Q56                      Were you serving as a police officer at that time by any chance?

A                       No, I was a private citizen.

Q57                      Do you know Miss Beauparlant's father by any chance?

A                       No.

Q58                      I think he's a retired Deputy in Letcher County.

A                       No, I didn't --

Q59                      Were you aware of that?

A                       I don't even know Miss Beauparlant. I just know her name and I know that she -- you know, where she's from and that's just from my services as a Deputy but I don't --

Q60                      Do you know whether or not --

MR. SHAW:

                      And if I start going too fast, let me know. I'm just trying to cut through. Sorry, didn't mean to talk over top --

Exhibit 1

ALISHA CONGLETON:

You're fine; you're fine.

Q61                  Do you know whether or not she was a frequent visitor to the Sheriff's Office?

A                  I don't recall. I don't recall like it being somebody -- there's some people that used to come there all the time but she's not one of those people that stick out.

Q62.                Which kinda leads to my next question, do you know who she would've been visiting if she were visiting the Sheriff's Office?

A                  I don't, other than maybe she could've been paying her water bill or her taxes.

Q63                  I believe at some point there were some statements made that she had friends in the Sheriff's Office and you don't know anything about that.

A                  No.

Q64                  I believe you testified you didn't actually see her fall; you went outside after she was already down?

A                  Yeah. I don't know that I didn't see her fall; I just don't really remember if I actually seen her fall but I do remember her falling; because I remember coming out there when she was either laying down, or getting up, or something like that.

Exhibit 1

Q65                          I'm gonna show you a few photographs. This is

a different view -- I think of the front door area -- that was provided by

Plaintiff's counsel.  Does that look like the area --

A                            Yes, it is.

Q66                          -- that you were talking about?

A                            Yeah.

MR. SHAW:

                             I'd like to introduce that as --

A                            Yes, the railing is gone.

MR. SHAW:

                             I'd like introduce that as Defense 1.

Q67                          You mentioned at some time after Miss

Beauparlant's fall that someone had painted around the perimeter?

A                            I know that it was painted. I don't remember if it

was after her fall or if it was after the guy run through the building.

Q68                          Is this what you're referring to, something like

this?

A                            Yes.

MR. SHAW:

                             I MOVE to introduce that as Defense 2.

Q69                          I have a little bit of a closer view of that corner

area after it was painted.

A                            Yeah.

Exhibit 1

| Q70 | Does that look familiar? |
| --- | --- |
| A | Yeah. |

MR. SHAW:

I MOVE to introduce that as Defense 3.

| Q71 | Did you take any photos of the scene -- |
| --- | --- |
| A | I don't recall. |
| Q72 | -- at the time of the fall? |
| A | No, I don't think I did. |
| Q73 | Do you know who maintains the sidewalks |

outside of the Sheriff's Office?

A              I would assume since the Fiscal Court came

over and painted this and -- that it'd be them, but I don't know that.

ALISHA CONGLETON:

The sidewalk or the --

MR. SHAW:

The sidewalk.

A              That, I don't know.  I assume that ever who

owns this building, which I think we agreed it was the Letcher County

Fiscal Court, would; but that, again, is an assumption, I don't know.

| Q74 | As we sit here today, you don't know who owns |
| --- | --- |

that building though --

| A | I don't -- |
| --- | --- |
| Q75 | -- correct? |

<u>Exhibit 1</u>

A                                    -- know.

Q76                                  Who would take care of snow removal for that
building, if you know?

A                                    I think Jordan would come over and like this
ramp here, would put salt down or something like that.

Q77                                  Do you know who would shovel the sidewalks
or who took care of the sidewalk area?

A                                    I don't; I don't even know if it was attended
period. I don't ever recall anybody out here shoveling it but Jordan, like
any -- any kind of snow removal like the -- probably Jordan would come
over and throw down salt or something.

Q78                                  You were asked a question something to the
effect that you'd been trying to get it fixed or someone had been trying to
get that area fixed. I believe you cleaned it up in your testimony. It's
possible that you said that but you don't recall saying that.

A                                    I don't re' -- no, I don't remember but it's
possible.

Q79                                  And you don't recall, other than possibly -- do
you recall doing anything trying to get that area fixed --

A                                    Myself, no.

Q80                                  -- like talking to anyone?

A                                    No.

Q81                                  So you didn't.

Exhibit 1

A                          No, I didn't. And again that would probably be LaShawna Frazier; she's the one that usually dealt with business matters like stuff like cleaning, stuff like that.

Q82                        Plaintiff's counsel had asked you about your employment with the Sheriff's Department and I've got here -- was this, would this have been around the last time that you worked, when you received that notice?

A                          Sometime around that, yeah, 'cause December 2018 would've been.

Q83                        And it was toward the end of I guess the former Sheriff's term.

A                          Yes.

MR. SHAW:

                          I MOVE to introduce this as Defense 4.

Q84                        According to I guess your Unemployment request, is this -- do you recall whether or not that's the reason for the layoff that was given?

A                          That was the reason that I was given; however, I don't think that's the reason.

Q85                        I understand you got --

A                          That's the reason I was given.

Q86                        -- some current litigation going on that --

A                          Yes.

Exhibit 1

MR. SHAW:

I MOVE to introduce this as Defense 5.

Q87    You had mentioned a few minutes ago that you believe that there were some issues or some problems between the Sheriff's Off' -- or I guess the Sheriff at that time and the County Judge. What do you base that on?

A    I don't think it was current problems. I just know that political stuff, I know they didn't like each other politically; and like the Sheriff had got upset at Jim Ward over removing funding from the Sheriff's Office and things like that, so --. Just overhearing conversations, I know they didn't like each other.

Q88    And the Sheriff that you served under was?

A    Danny Webb.

Q89    Sheriff Webb was Sheriff for how many terms, if you know?

A    Four terms, 16 years.

Q90    I think Sheriff Webb was also retired State Trooper.

A    He was, yes.

Q91    Retired KSP; I don't know if he's a Detective or Trooper. So would you have been politically aligned with Judge Ward?

MR. COMBS:

Object to the form.

Exhibit 1

ALISHA CONGLETON:

I'm sorry?

MR. COMBS:

You can answer.

Q92     You were pretty active in the election cycle.

A     Well, not in Jim Ward's election but the Sheriff
election, because that involved my job.

Q93     So you limited your involvement in the Sheriff's
race; you didn't get involved in the County Judge's race.

A     No, I didn't get out and campaign for him. I
wanted somebody that would -- I didn't vote for Jim Ward but --

MR. SHAW:

I wasn't gonna ask you how you voted, that's

between you and --

A     But I mean it's -- I wanted somebody that
would fund the Sheriff's Office but it's nothing personal against him or
anything like that. I just -- you know; but, no, I didn't get involved with the
Judge's election, I's involved in the Sheriff election.

Q94     So if you were active on social media, if you
were active out in the community campaigning and making statements,
that would've been limited to the Sheriff's race; you didn't actively
campaign for or against the candidate for County Judge.

A     Not to my knowledge, no.

Exhibit 1

Q95       I'm trying to figure out if you got an axe to grind with the county, so that's why -- that's why I'm asking you these questions.

A       Oh, no; no, I --

Q96       Or with Jim Ward.

A       No.

Q97       Were you around the office often during the workday?

A       Yeah; I mean I'd come in and out and do paperwork. During tax time, we had to kinda pitch in and help 'cause it got real busy. So during tax time, we were there more often.

Q98       And you don't recall Miss Beauparlant coming into the office.

A       I don't; no, I don't. She could have, I just don't recall.

Q99       Were you considered a county employee or an employee of the Sheriff's Office?

A       I think I was actually considered a county employee.

Q100       Do you know if the Sheriff's Office fee pools?

ALISHA CONGLETON:

       Like pools fees for like --

MR. SHAW:

       Yeah.

Exhibit 1

ALISHA CONGLETON:

       -- vehicle inspections --

MR. SHAW:

       Payroll and all that, yeah.

A       Yes, they do. They do vehicle inspections, carry/conceal, paper service and things like that.

Q101       The Sheriff's Office does.

A       Yes, they collect fees for that.

Q102       Well, do they pool the funds, if you know, into the county and the county manages basically funds for the Clerk's Office, the --

A       Honestly, I think it depends on the relationship between your Sheriff and your County Judge; because sometimes, some counties the Judge's Office will pay the employee insurance and sometimes, they won't. Like used to, they paid the Letcher County Sheriff's Department's employee insurance. Well, they got mad at each other and quit doing that or -- you know, things like that. So I don't -- that's kind of a hard question; but the Sheriff's Department pays their own. When I worked there, they -- they fully paid for everything themselves. To my knowledge, I don't think --

Q103       So your insurance, you weren't on the county's insurance policy.

Exhibit 1

A                              We were but we had to pay for it. Like the

Sheriff's Office paid for it out of the money that they collected but they -- it

was through the county so --

Q104                           I'm talking about your health insurance --

A                              Yeah.

Q105                           -- that type of --

A                              Yeah, I think -- I think what happened is that it's

through the county but the Sheriff's Office had to pay the county.

Q106                           I think at some point somebody raised an issue

with your employment about the use of a benefits card or something like

that. Do you recall that ever coming up?

A                              Yes, I do, uh huh.

Q107                           Was that card, was that something that was

provided through the Sheriff's Department or provided through the county?

A                              It was given to me by the Sheriff's Department

but it was through the county.

Q108                           Through the county?

A                              Yeah.

Q109                           And I guess at some point, there was a

question that came up about how --

A                              How it was spent.

Q110                           Yeah, how the money was spent on the card --

A                              Yeah, we --

Exhibit 1

Q111                              -- but maybe there was a breakdown in the

policy between the --

A                              Yeah, they --

Q112                              -- Sheriff's Department and the county how

they or something -- I don't know.

A                              Yeah, the Sheriff's Office took money from our

account or our paychecks to put on that card, like so the money that was

raised up in issue was the money I put on there myself; so I think that's

probably --.

Q113                              It's my understanding at some point you had

obtained money from that card and that was the issue the --

A                              I had -- like you get -- the benefits card, you

can buy like -- to my knowledge, I was told you could buy like

prescriptions, medical supplies and things like that. The pharmacy that I

use, one of the ladies there that I investigated in a drug trafficking case

had brought that up; but she had got like $50 cash in there and I bought

ban' -- like the pharmacy was like having a, I guess you would say -- not

going out of business sale but they had a -- a case and they were getting

a new vendor. So they're getting rid of all their -- they had band-aides,

canes, stethoscopes, things like that.  So I was told you could buy like

medical stuff, so I bought a bunch of -- of that stuff, so, yeah.

Q114                              So it wasn't -- I mean so you didn't get cash off

the card.

Exhibit 1

| | |
|---|---|
| A | I got cash off the card for that, yeah, so I got -- |
| MR. SHAW: | |
| | Okay, alright. |
| Q115 | The reason I ask you about that, it's my |

understanding the pharmacy -- who -- who owns the pharmacy? Is it one

of your family members?

| | |
|---|---|
| A | No. |
| Q116 | So you didn't have a sister-in-law or somebody |

in your family that owned --

| | |
|---|---|
| A | No, she -- |
| Q117 | -- the pharmacy or -- |
| A | She owned it years ago but she didn't own it |

whenever that occurred.

| | |
|---|---|
| Q118 | What was the name of that pharmacy? |
| A | It's Boggs' Pharmacy. |
| Q119 | And that's in Letcher County, right? |
| A | Uh huh. Yeah, I's doing a -- |
| Q120 | So at that time, did your -- was it your sister-in- |

law or your --

| | |
|---|---|
| A | My sister-in-law owned it previously but not |

during that when that -- that incident occurred.

| | |
|---|---|
| Q121 | How long would she -- |
| A | I think that's -- |

Exhibit 1

Q122                         -- have owned it?

A                            -- what --. That's what was alleged, because
the lady I had investigated for a drug indictment brought that up, you
know, like I'd done something wrong or whatever; that I was doing it
because my sister-in-law owned the pharmacy but she didn't own the
pharmacy.

Q123                         The reason I'm asking about it, I was trying to
back back around 'cause it was my understanding it was a pharmacy in
Letcher County; and I'd asked you if you were related to anyone that
worked in Letcher. So you're saying that, you know, during the time --
during this time period, would she have owned the pharmacy?

A                            No, I don't think so. I think Jay and Christie
Graham owns the pharmacy.

Q124                         What's your sister-in-law's name?

A                            Summer Powers.

Q125                         Summer Powers?

A                            Um hmm.

Q126                         Who's she married to? Which one of your --

A                            David Powers.

Q127                         -- brothers?

A                            She's not. That's my -- I'm sorry; that's my
wife's sister.

Exhibit 1

MR. SHAW:

Okay, alright.

A  My family -- I don't have any family that works in Letcher County.

Q128  Okay, alright, that's where the confusion was. I thought --

A  Yeah.

Q129  I thought it was one of your brothers', sisters maybe --

A  No. My wife's sister --

Q130  So you don't have --

A  No.

Q131  What about your wife's family? Who does she have that's immediately related to her that works in --

ALISHA CONGLETON:

That works in Letcher County?

A  Immediate family right now, she doesn't, 'cause her sister doesn't live in Letcher County anymore; and at the time, her sister didn't work in Letcher County either. Like her sister worked in -- in Virginia or something. Even during that incident, she didn't have any immediate family that worked in Letcher County, other than her mother. I'm sorry, her mother worked at the pharmacy, yes; but she's retired now,

Exhibit 1

so she doesn't work. And if I've overlooked any -- I don't -- I don't think I have.

Q132        Ashley's -- how many -- how many siblings does she have?

A        Just the one.

Q133        Just the one?

A        Um hmm, and that's the one that used to own the pharmacy.

Q134        Do you recall whether or not Miss Beauparlant, was she able to get up, you know?

A        I don't remember if she got up on her own, or if she got up with help or -- or what.

Q135        And you don't remember anything about how she left the premises?

A        I don't.

Q136        It's your understanding the Sheriff and County Judge maybe didn't get along very well.

A        I don't think they liked each other; that's an assumption, you know.

Q137        Well, did you ever see the County Judge hanging around the Sheriff's Office, or visiting, or anything, or did he seem to --

A        No, they --

**56**

<u>Exhibit 1</u>

Q138                    -- stay clear of it?

A                       They didn't have coffee together or anything,
never.

Q139                    In the four years you were there, how often did
you see the County Judge in the Sheriff's Office?

A                       I don't know that I ever did.

Q140                    This claim loss form that was introduced, would
that have -- you said that was filled out by you, is that correct?

A                       It was.

Q141                    Do you remember how close in time to the --
the accident that that would've been filled out?

A                       I'd imagine it was the day that it happened. If
the incident occurred on November the 1st -- oh, that's when I put -- I'm
assuming I filled -- I would've filled it out the same day; 'cause if I wouldn't
have, I wouldn't remembered what happened anyway.

Q142                    I'm assuming the identifying information on
Miss Beauparlant would've -- would've came from her?

A                       Yes.

Q143                    Do you remember if there were any other
employees of the Sheriff's Department, or -- outside with you, or anyone
else that went out to check on her?

A                       Eugene Slone and LaShawna would've been
there 'cause they both worked in the office.

Exhibit 1

Q144                     What about employees of the water department or anyone else in the vicinity that would've came over that you'd have known or recognized?

A                      I can't re' -- to be honest, I can't remember their names but I'm sure that they would've came out.

Q145                     Do you remember what she was wearing?

A                      I don't.

MR. SHAW:

Pass the witness.

MR. COMBS:

Could I see Exhibit -- well, just the Defense Exhibits?

(Reporter's Note:

Reporter produces Defendant Exhibits 1 - 5.)

RE-EXAMINATION

By Mr. Combs

Q1                      I'm gonna hand you Defense Exhibit 5, which I think is the Unemployment notice; and the reason that -- the explanation for the termination, you had testified earlier that you agree that's the reason you were given but you don't think that's the real reason. Is that what your testimony was?

Exhibit 1

A                         That's correct.

Q2                        And what did you mean by that?

A                         The current Sheriff, Mickey Stines, has a
political -- I don't know what you would call it; he doesn't like me and he
told everybody in the world that he was gonna get rid of me if he was
elected.

MR. COMBS:

                          I see.

A                         And I think that I was laid off by Danny Webb
to prevent Mickey from having to fire me, because they were afraid of -- of
a lawsuit or something to that nature.

Q3                        Were you given any kind of notice or
explanation, whether verbal or written, prior to receiving that?

A                         No.

Q4                        So had the issue of lack of oil and gas bills -- I
think is what it says -- had that issue ever been mentioned to you
previously?

A.                        No; I wouldn't think that we had any sort of
financial troubles; because I think a week or two prior to this layoff for lack
of budget, they handed out thousands of dollars worth of bonuses to
employees, myself included. So if you are -- you can't pay your payroll for
lack of money, then you wouldn't be handing out bonuses, I don't think.

Exhibit 1

Q5                              And going back to Defense Exhibit -- Exhibits 2
and 3.  They're in order, so if you could flip to pages -- the second and
third page, those two.

A                               I'll just lay them all out here.

Q6                              That -- the paint -- the yellow paint that you see
around the sidewalk on each photo, can you say with any degree of
certainty when that paint was put there?

A                               I'm almost positive it was after the fall of Miss
Beauparlant.  When, I don't -- it was shortly thereafter that incident.

Q7                              And what about the cones?

A                               I think those were put there at the same time
the paint was.

Q8                              Do you know who -- who those cones belong
to?

A                               I'm assuming the Fiscal Court brought them
over, 'cause I'm pretty sure Jordan's the one painted that.

Q9                              Was the paint and/or cones present as of your
most -- your last time at the office as an employee?

A                               I know the paint was. I don't remember if the
cones were or not.

Q10                             And what about this most recent time that
you'd visited the Sheriff's Office in 2019?

Exhibit 1

A                      The paint would've been there but I don't recall
if the cones were still there or not.

Q11                    So the best of your memory, the paint's still
there now?

A                      Yes.

Q12                    And with respect to the -- the Unemployment
request, you currently -- you've testified you have current litigation
pending?

A                      Yes.

Q13                    I won't go into that and certainly don't want you
to tell me anything that you would've told your attorney in that case but, do
you know which Court that litigation is pending in?

A                      Federal Court.

Q14                    Do you know what type of action it is that you
filed?

A                      It's a civil -- it's a civil rights.

Q15                    And who did you name as the Defendants, if
you know?

A                      Mickey Stines and all -- I'm not sure who -- who
else that consists of but it's against Mickey Stines is who --

Q16                    Is Jim Ward in any way named as a
Defendant?

A                      No.

Exhibit 1

Q17                         Or the Letcher County Fiscal Court.

A                           To my knowledge, it's Mickey Stines and if he's

part of the Fiscal Court, so be it; but it's Mickey Stines is who.

Q18                         Do you know the present status of that case?

A                           Hasn't really went anywhere yet. We've done

like our Interrogatories and things, so --

MR. COMBS:

                            Alright, I understand.

A                           We're not in Court yet or --.

MR. COMBS:

                            Pass the witness, that's all I've got.


MR. SHAW:

                            Since he asked, I gotta ask you a few other

                            just short questions.

ALISHA CONGLETON:

                            Okay.

                            EXAMINATION

                            By Mr. Shaw

Q1                          You testified a little earlier that the Fiscal Court

had taken money from the Sheriff's Office.

A                           Yes; well, I mean I -- I'm just going on what I --

on conversations that I listened to and excuses as to why I couldn't get

Exhibit 1

something -- you know -- certain things. Like for instance, I'll give an example. The Sheriff's Office, as a Deputy, typically you would get hazardous duty retirement. Well, they had people sitting in the office doing clerical work that was receiving hazardous duty retirement; and I raised that issue as to why, you know, I was out here almost getting stabbed a few times and different things and why I wasn't getting hazardous duty retirement and it was blamed on the fact that Jim Ward took the funding away for that. So when I say that, that's what I mean. I haven't set down and seen figures on a paper or anything like that.

Q2              It's your understanding --

A               I just know --

Q3              -- from what you heard from office talk --

A               Yeah, office talk.

Q4              -- around the office.

A.              Yeah.

Q5              The issue I guess with the funding, do you remember what type of time period that would've came up?

ALISHA CONGLETON:

                What do you mean?

Q6              Was it toward the end of Sheriff Webb's tenure or was it beginning of his last term?

ALISHA CONGLETON:

                The funding that Jim Ward --

Exhibit 1

MR. SHAW:

Yeah.

ALISHA CONGLETON:

-- supposedly --

MR. SHAW:

Um hmm.

Q7          Did this happen before you ever, you know, came in as a Deputy?

A          I don't -- I think that -- I think the whole time -- at some point in time, I think they -- I think Jim Ward, soon as he took office, I can -- just from office talk, maybe took some of the funding; some of the things that the prior Judge paid for for the Sheriff's Office, like maybe employee insurance and stuff. The new -- when the new administration took over, which was Jim Ward, I think he started making them pay for their own stuff and I think that was part of the reason they didn't -- the Sheriff didn't really like him.

Q8          And then Sheriff Webb -- were there -- I guess towards the end of your employment with the Sheriff's Office, were there any issues raised with, I guess, personal attacks that you were making towards family members of candidates on social media or something of that nature?

ALISHA CONGLETON:

Family members?

Exhibit 1

MR. SHAW:

Yeah.

A            No, not to my knowledge. I was told that I couldn't campaign for -- just to stay out of the campaign, which I don't know why you wouldn't be allowed to campaign for somebody you wanted; but, no, I've never -- I would never get on social media and attack anybody or say anything bad. I might would express my -- you know, who I want to -- to win but, you know, or campaign. If you're campaigning for somebody, you ain't gonna get on there and say anything bad anyway; but I would never say anything.

Q9           I's just trying to figure out, do you know if there were any complaints about that that were raised that you're aware of, that came to --

A            Not to my knowledge --

Q10          -- Sheriff Webb.

A            -- no.

Q11          What about any issues with taking photos or putting on social media photos of accident victims?

A            Not to my knowledge.

Q12          What about photos or identifying witnesses on Facebook that says like "rats," or a little rat symbol or something like that?

A            No, I don't know. If you could explain what you're talking about, I don't --

Exhibit 1

Q13            I'm just trying to find out that Sheriff Webb ever addressed any issues like that --

A            No.

Q14            -- with you.

A            Not with me, no.

Q15            Are you aware of any citizen complaints that were ever made to the Sheriff's Office about any of those issues?

A            Not to my knowledge, no.

Q16            Do you know whether or not there were ever any issues raised with Sheriff Webb, I guess, alleging that you were campaigning on county time; or that you were placing social media posts during county time --

A            No.

Q17            -- while you were at work?

ALISHA CONGLETON:

            That Sheriff Webb had said that to me?

MR. SHAW:

            Yeah.

Q18            That he would've asked you not to -- not to campaign during -- during work hours; or, you know, "You need to stay off social media during work hours;" or "Don't post these things during work hours," or something like that.

A            No.

Exhibit 1

Q19                        What was it that Sheriff Webb had told you not to do?

A                        He just told me not to -- not campaign. Like for instance, my wife and I on my own personal time had attended Jenkins Day Festival and we were wearing shirts for the candidate, Eugene Slone; and we posted a picture of ourselves wearing those shirts and I was told to take it off, and I couldn't put stuff on there. I don't know why. I mean there's nothing in the policy about that; there's nothing illegal about that.

Q20                        Was Sheriff Webb running again or was he --

A                        No, he --

Q21                        So he wasn't a candidate or anything.

A                        No, he wasn't a candidate but I was -- I was -- I was very strictly told that I couldn't campaign for Eugene Slone on social media or just, you know, period; couldn't put signs in our yard, things like that; even asked me to tell my wife not to post stuff on Facebook, so --.

Q22                        Sheriff Webb did?

A                        Yes. I never put anything bad on Facebook, like politically or anything like that.

Q23                        And when you left the Sheriff's Department, your rank was --

A                        Sergeant.

Q24                        -- Sergeant?

A                        Um hmm.

Exhibit 1

| | |
|---|---|
| Q25 | Who was above you? Was there anybody above you, between you -- |
| A | Barry -- |
| Q26 | -- and the Sheriff? |
| A | -- Engle was the Captain. |
| Q27 | Captain. |
| A | Yes. |
| Q28 | Then above Captain would be the Sheriff. |
| A | Yes. |
| Q29 | Did you have any Deputies under you as Sergeant? |
| A | Sidney Fields; and then all the Bailiffs would've been under me. |
| Q30 | How many Bailiffs were there? |
| A | Two. |
| MR. SHAW: | Pass the witness. |
| MR. COMBS: | That's it for me. |
| | (DEPOSITION CONCLUDED) |

Exhibit 1

STATE OF KENTUCKY

COUNTY OF PIKE


I, Shirley S. Hensley, Notary Public in and for the State of Kentucky at Large, whose commission as such will expire March 25, 2021, do hereby certify that the foregoing deposition of **ALISHA CONGLETON** was taken at the time, place, and for the purposes stated in the caption hereto.

I further certify that said taking was pursuant to Notice Of Deposition; that appearances were as stated in said caption; that the witness was first duly sworn by me before testifying; that said testimony was taken by me in shorthand notes and by tape-recording and later reduced to typewritten material herein, which is a true, full, complete and accurate transcript thereof; that the parties did not request the reading and signing of the deposition of said witness.

IN TESTIMONY WHEREOF, I have hereunto set my hand at Pikeville, Kentucky, this 18th day of July, 2019.

SHIRLEY S. HENSLEY, REPORTER

Exhibit 1

Google Maps    Webb St



Image capture: Apr 2012    © 2019 Google

Whitesburg, Kentucky

 Google

Street View - Apr 2012



Exhibit 1



PLAINTIFF'S
EXHIBIT
B

Exhibit 1

# Public Entity Insurance
# CLAIM/ LOSS FORM

Name of Insured/Entity: Letcher Co Fisical Court

Contact Person: Hettie Adams

Telephone # 606-633-2129 Fax #

Type of Claim – "Circle all that apply."
Property•Inland Marine (Equipment)•Crime•General Liability•Law Enforcement•Automobile
Liability•Automobile Physical Damage•Errors & Omissions

Date Claim Occurred: 11-05-17 Date Reported: 11-21-17

Insured's Vehicle:

PLAINTIFF'S
EXHIBIT

C

VIN#

Driver's Name

Were the police contacted? Yes No If yes, which department?
**If you have a police report, please fax it with this form.

## Claimant Information:

Name: Ruby Beau Parlant Telephone # 606-832-2761
Address: 317 Improvement Br. Jenkins. KY
Vehicle: VIN#:
Insurance Company: Policy #:

## Location of Accident/Incident
L.C. Info. Dept Letcher Co. Shariff's Dept

## Description of Accident/Incident:
Beau parlant fell when she stepel on brickes Contreat
to left of-door when she Exited Shariffs Dep.
Visible scratlnes to Left knee. Advises she twisted
right Ankle

Any Injuries? Yes No
If yes, please list the person's name and extent of injury if known.
Ruby Beau Parlant
Right Ancle,
Left knee

Public Entity Insurance
1056 Wellington Way, Suite 130
Lexington, KY 40513

Phone #:      859-296-4580
Toll Free #:  888-696-9620
FAX:          859-296-4583

OR

KACo Claims

Phone #:   866-367-5226
(Press 0 and ask for Stacy Ficken)
Fax #:     502-489-6430 or
           502-489-6435

Insured: Ruby Beauparlant
317 Improvement Br.
Jenkins KY. 41537
606-832-2761

Reported taken B)
A. Congleton
JJt LLSD

Exhibit 1

Google Maps    Letcher County Sheriff Office



 John Mackinnon

Photo - Jul 2013



Image capture  Jul 2013    Images may be subject to copyright.

Exhibit 1



Exhibit 1



Exhibit 1



DEFENDANT'S
EXHIBIT

3



**Danny R. Webb**
**SHERIFF OF LETCHER COUNTY**

6 Broadway Street
Whitesburg, Kentucky 41858

Phone 606-633-2293
Fax 606-633-8780

December 17, 2018



DEFENDANT'S
EXHIBIT

4

Dear Alisha,

I wanted to personally thank you for your service to the Letcher County Sheriff's Department. I will never forget all the hard work that you put in so that our department would be successful.

I remember when you first started dispatching for us when first entered the field of law enforcement. I am so proud of you for becoming one of the best police officer's I have had the pleasure of working with during my career.

I wish that everything could have turned out better for you, but sometimes we have to play the cards we are dealt. I hope that you will land on your feet, and continue your work as a police officer.

Thanks,

Sheriff Danny R. Webb

Exhibit 1

COMMONWEALTH OF KENTUCKY
DIVISION OF UNEMPLOYMENT INSURANCE
275 E MAIN STREET, 2ND FLOOR EAST
FRANKFORT, KY 40621-0001



**DEFENDANT'S EXHIBIT**
5

**401**

Date Processed: **12/17/2018**
Claimant's Name: **ALISHA CONGLETON**
Benefit Year End: **12/14/2019**

Social Security #: XXX-XX-7234
Program Code: **UI**

### Most Recent Employer Information

Employer Name: **LETCHER COUNTY SHERIFF**
Street Address: **6**

Phone Number: **6066332292**
Date Started : **02/13/2015**
Last Day Worked: **12/13/2018**

City: **WHITESBURG**       State: **KY**       Zip: **41858**

Separation Reason: **Lack of Work**
Secondary Reason: **Laid Off / No Recall**
Explanation: **BUDGET CONSTRAINTS DUE TO LACK OF OIL AND GAS BILLS**

Have you worked for this employer in 10 or more separate weeks during the base period?
**Yes**

¡IMPORTANTE! Este documento(s) contiene información importante sobre sus derechos, obligaciones y o beneficios de compensación por desempleo. Es muy importante que usted entienda la información contenida en este documento

INMEDIATAMENTE: Si necesario, por favor de ir a la oficina de Kentucky Career Center, si necesita asistencia para traducir y entender la información contenida en el documento(s) que recibió, puede encontrar su oficina local en  www.kentuckycareercenter.com





**Equal Education and Employment Opportunities M/F/D**

11749902  48613482                                   Program code  01        BYE  12/14/2019

Exhibit 1